# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, ) | |
|     Plaintiff, ) | CR 07-1834-TUC-RCC (JCG) |
| ) | |
| vs. ) | **REPORT & RECOMMENDATION** |
| ) | |
| 6) Luis Javier Camacho-Ponce, ) | |
|     Defendant. ) | |

Pending before the Court is Defendant Luis Camacho-Ponce's Motion to Suppress filed on November 19, 2007. (Doc. No. 23.) The United States filed a response on January 2, 2008. (Doc. No. 29.) Defendant did not file a reply.

This matter came before the Court for a report and recommendation as a result of a referral made on October 3, 2007, pursuant to LRCrim 5.1. (Doc. No. 9.) This matter was set for evidentiary hearing and evidence was heard on January 15, 2008. Defendant, who remains in custody at this time, was present and represented by counsel. This matter was submitted following oral argument at the conclusion of the hearing and taken under advisement.

Having now considered the matter, the Magistrate Judge recommends that the District Court, after its independent review, grant in part and deny in part Defendant's Motion to Suppress.

## FACTUAL FINDINGS

United States Border Patrol Agents Henesy, Buchheit, Floyd and Curry testified on behalf of the government. They testified as follows:

1         On September 28, 2007 at approximately 2:30 a.m., U.S. Border Patrol agents on
2 patrol duties near Three Points, Arizona, spotted a group of seven men through infrared
3 scopes. The men were carrying large bundles on their backs, leading the agents to suspect
4 that the men were transporting narcotics. Border Patrol Agent Henesy was finishing up with
5 the capture and arrest of two other groups of narcotics backpackers in nearby sections of the
6 desert. He was the first to respond to the report of the seven men spotted near Three Points.
7 When he arrived on the scene, he heard the sounds of people running away from him. A
8 Border Patrol helicopter shone its light on Defendant as he was running. With the help of
9 the helicopter, Agent Henesy was able to find Defendant hiding in tall brush. Agent Henesy
10 pinned Defendant to the ground with one knee in order to handcuff and search him. After
11 handcuffing Defendant, Agent Henesy pulled Defendant up to a standing position and asked
12 him, in Spanish, "Where are the others? Where is the marijuana?" Agent Henesy believed
13 that Defendant was in his custody at the time he asked him these questions. Defendant
14 responded by saying "over there" in Spanish and gesturing with his head toward an area in
15 the desert.

16         As Agent Henesy was walking with Defendant toward the area to which Defendant
17 had gestured, other Border Patrol Agents began arriving on the scene. Agent Henesy handed
18 Defendant over to Agents Buchheit and Floyd so that Agent Henesy could assist in the
19 capture of another suspect. Agent Floyd asked Defendant in Spanish "where are the drugs,"
20 and Defendant again answered in Spanish "over there" and gestured with his head toward an
21 area in the desert. Defendant then led Agents Floyd and Buchheit to an area approximately
22 50 yards away where they discovered eight bundles of marijuana in a wash. A further search
23 of the area did not reveal any more contraband.

24         Agents Henesy, Buchheit and Floyd each testified that, if Defendant had not led them
25 to the marijuana bundles, the agents would have searched the area where Defendant and his
26 co-defendants were detained until the drugs were discovered. Each agent testified that the
27 search would begin with tracking the footsteps of the backpackers and that agents would
28

1  have brought in drug-sniffing dogs if necessary to find the drugs. They also testified that if
2  the agents had not found the drugs by the end of that shift, the next shift would continue the
3  search.

4        The agents drove Defendant and several other backpackers who had been arrested at
5  the scene to the Border Patrol station in Tucson. Each of the agents testified that no agent
6  asked Defendant any questions during the transport to Tucson. At the station, Defendant was
7  placed in a cell with approximately seven other detainees from several groups of backpackers
8  that had been captured that night. Agent Floyd removed the detainees from the cell and read
9  them their Miranda rights as a group, in Spanish. Agent Floyd asked the group if they
10 understood their rights and each of them responded in the affirmative. The detainees were
11 then returned to the cell and then removed from the cell one at a time for questioning.

12       Defendant was one of the last detainees to be questioned by the agents. After
13 removing Defendant from his cell, Agent Floyd asked him if he was willing to talk to agents
14 without an attorney present. When Defendant indicated that he would speak to the agents,
15 Agent Floyd read him the waiver provision of Form 214 in Spanish. The Form states:

16     I am willing to make a statement and answer questions. I do not want a lawyer
    at this time. I understand and know what I am doing. No promises or threats
17     have been made to me and no pressure or coercion of any kind is being used
    against me.
18
19 Agent Floyd then asked Defendant to sign the form, which Defendant did. Defendant was
20 then questioned by Agents Floyd and Buchheit; he told the agents that the three groups of
21 backpackers the agents had pursued that night had all been a part of one large group, that
22 Defendant was a part of the group, and that Defendant had transported drugs into the country
23 on his back.

24       Agent Curry testified that he was assigned to local duties at the Tucson Station on the
25 night of Defendant's arrest. He did not have a specific recollection of processing
26 Defendant's case, but he offered testimony regarding his practice in processing detainees.
27 Agent Curry uses a standard form to gather biographical information about the detainees.
28 The form is for administrative purposes. A copy of the form, signed by Defendant, was

1  admitted as Exhibit 4 at the hearing.  Although the form contains a Notice of Rights
2  provision written in English, Agent Curry could not recall whether he read the provision to
3  Defendant in Spanish.  He usually asks detainees questions necessary to complete the form
4  prior to other agents giving the detainees any Miranda warnings, but he was not sure that was
5  the sequence of events in this case.

6  Defendant offered testimony contradicting some of the agents' testimony.  Defendant
7  stated that when Agent Henesy captured him in the desert, he pointed a gun at Defendant and
8  said "if you don't want to go to prison, tell me where the pot is."  Defendant testified that he
9  led the agents to the place where the drugs were hidden because he was afraid he would be
10 beaten if he did not do so.  Defendant testified that, once he was transported to the Border
11 Patrol station, the agents told him to sign several documents without explaining them, and
12 that Defendant signed the documents without understanding their meaning.  At one point in
13 his testimony, Defendant denied being read his rights.  Defendant later stated that the agents
14 only told Defendant some of his rights, but only after he had signed the documents, and that
15 he did not understand that he had the right to remain silent until after he had signed the
16 documents.  When asked by the Magistrate Judge to clarify his testimony, Defendant gave
17 conflicting answers.  He was asked and answered the following questions:

> COURT: The agents testified that before anyone was taken out individually and questioned, that the agents came to the group as a whole and advised the group as a whole of their rights to an attorney and rights to remain silent.  The agents also testified that they then asked everyone in the group if they understood their rights.  Do you agree that the agents advised everyone as a group of their rights or do you deny that that happened?
>
> DEFENDANT: Well, I don't recall.  I don't recall when they read the rights to all as a group.
>
> COURT: You don't remember or you deny that it happened?
>
> DEFENDANT: No, I don't recall.  I don't recall they haven't told us about those charges, those rights.

26 After hearing evidence, the Magistrate Judge asked the parties to clarify the issues
27 genuinely in dispute, specifically: (1) whether the Defendant challenged the application of
28 the inevitable discovery doctrine given the testimony at the hearing, and (2) whether the

- 4 -

Government conceded that the Defendant was in custody at the time that he responded to agents' demands to tell them the location of the marijuana.[1] The parties requested an opportunity to provide supplemental briefing on these issues and were ordered to submit any additional authority by January 30, 2008. On that date, the government submitted a document indicating it would not present additional authority. (Doc. 61.) The Defendant did not file any further authority.

## ANALYSIS

Defendant seeks to suppress the statements he made to agents on the ground that they were not voluntary and were obtained in violation of Defendant's Fifth Amendment rights.

There are two sets of statements at issue in this case: (1) Defendant's statements at the scene of his arrest when, in response to questioning by agents, Defendant lead agents to the marijuana, and (2) Defendant's statements that he was paid to carry marijuana across the border and that he was part of a large smuggling group, made to agents at the Tucson Area Border Patrol station after Defendant was advised of his *Miranda* rights.

**1.     Defendant's statements at the scene of his arrest**

*Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny govern the admissibility of statements made during custodial interrogation in both state and federal proceedings. Statements made while a defendant is in "custody or otherwise deprived of [his] freedom of action in any significant way" which are not preceded by *Miranda* warnings are inadmissible in evidence. *Id*. at 444. "When a claim is made that a person has been subjected to custodial interrogation, [courts] are required to consider whether, under the totality of circumstances, 'a reasonable person in such circumstances would conclude after brief questioning he or she would not be free to leave.'" *United States v. Hudgens*, 798 F.2d 1234, 1236 (9th 1986) (quoting *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir.1982)).

---

[1] In its Opposition, the government had argued that the Defendant was not in custody and therefore that his statements regarding the location of the marijuana should not be suppressed.

- 5 -

1    Agent Henesy testified that Defendant was in custody at the time Agent Henesy asked
2 him "where are the others? Where are the drugs?" Agent Henesy also testified that he did
3 not give Defendant his *Miranda* warnings prior to asking him these questions. Thus, because
4 Defendant's statements regarding the location of the drugs were made while in custody and
5 prior to Miranda warnings being given, they are inadmissible.

6    Defendant has moved to suppress the statements made to agents at the scene, but not
7 the drugs themselves. It is worth noting that, although the drugs were discovered as the
8 result of an inadmissible statement made by Defendant, they are nonetheless admissible.
9 Under the inevitable discovery doctrine, even if evidence is initially obtained by unlawful
10 government conduct, "[i]f the prosecution can establish by a preponderance of the evidence
11 that the information ultimately or inevitably would have been discovered by lawful means
12 ... then the deterrence rationale [for the exclusionary rule] has so little basis that the evidence
13 should be received." *United States v. Merriweather*, 777 F.2d 503, 506 (9th Cir. 1985) (citing
14 *Nix v. Williams*, 467 U.S. 431(1984)); *see also United States v. Lang*, 149 F.3d 1044, 1048
15 (9th Cir. 1998) (holding that officers' credible testimony satisfied inevitable discovery
16 doctrine and made evidence admissible where officers testified that, based on their training
17 and experience, hidden narcotics are often discovered in an engine compartment and
18 therefore the officers would have searched the engine compartment regardless of defendant's
19 incriminating statements). The agents offered consistent and uncontradicted testimony
20 establishing their agency practice of searching for drugs in an area where backpackers are
21 arrested. According to the agents, they would have searched for the drugs by "tracking" the
22 area and/or bringing in drug-sniffing dogs and the search would have continued until the
23 drugs were found. Thus, the government has met its burden of proof in demonstrating that
24 the drugs would inevitably have been discovered by lawful means.

25   **2.    Defendant's statements at the Tucson Area Border Patrol station**

26    For incriminating statements obtained during a custodial interrogation to be
27 admissible, any waiver of *Miranda* rights must be voluntary, knowing, and intelligent. *See*
28 *Miranda*, 384 U.S. at 479. A waiver of *Miranda* rights "is knowing and intelligent if, under

- 6 -

1 the totality of the circumstances, it is made with a full awareness of both the nature of the
2 right being abandoned and the consequences of the decision to abandon it." *United States v.*
3 *Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir.2005) (citations and quotations omitted).
4 There is a presumption against waiver, and the Government bears the burden of proving a
5 valid waiver by a preponderance of the evidence. *See Colorado v. Connelly*, 479 U.S. 157,
6 168 (1986); *United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir.1986).

The government presented sufficient evidence that Defendant's waiver of his rights was knowing and intelligent. Agent Floyd offered credible and reliable testimony demonstrating that Defendant was read his Miranda rights in Spanish, read a waiver of rights form in Spanish, and that Defendant voluntarily waived his rights and spoke to the agents. In addition, the government presented a copy of the waiver form signed by Defendant and Defendant admitted to signing the form. Although Defendant testified at one point in the hearing that he was not read his rights, and did not understand what he was signing, Defendant later stated that the agents told Defendant some of his rights, that he understood his right to remain silent after he had signed the documents, and that he could not recall whether he made a statement to agents before or after signing the documents. Defendant's testimony was inconsistent and he was not a credible witness. Thus, the Court concludes that Defendant's request to suppress statements he made at the Border Patrol station should be denied.

**RECOMMENDATIONS**

In view of the foregoing, it is recommended that, after its independent review of the record, the District Court GRANT in part and DENY in part Defendant's Motion to Suppress. (Doc. No. 23.)

It is recommended that the District Court grant the Defendant's request to suppress Defendant's statements at the scene of his arrest when, in response to questioning by agents, Defendant led agents to the marijuana.

It is further recommended that the District Court deny the Defendant's request to suppress Defendant's statements that he was paid to carry marijuana across the border and

1  that he was part of a large smuggling group, made to agents at the Tucson Area Border Patrol
2  station after Defendant was advised of his *Miranda* rights.
3        The parties have **ten (10) days** to serve and file written objections to the Report and
4  Recommendation. The parties are advised that any objections should be filed with the
5  following caption: CR 07-1834-TUC-RCC.
6        DATED this 12th day of February, 2008.

Jennifer C. Guerin
United States Magistrate Judge